MAYOR AND ALDERMEN OF SAVANNAH *et al. v.* GRESHAM.

SIMMONS, C. J.   Where an execution had issued to collect a license-tax imposed by a municipal ordinance upon a particular business, and the defendant in execution filed an equitable petition to enjoin its collection, on the ground that he was not engaged in a business to which the ordinance in question was applicable, and at the hearing the contrary was affirmatively and conclusively proved, it was error to grant a temporary injunction suspending the further progress of the execution.

*Judgment reversed.   All the Justices concurring.*

Argued February 18, — Decided March 8, 1897.

Injunction.   Before Judge Falligant.   Chatham county. June 16, 1896.

Gresham brought his petition alleging that the city marshal has levied a tax execution on property of petitioner, to collect $250 alleged to be due the city by him as a specific tax or license upon him as a "person, other than a pawnbroker, engaged in the business of lending money on personal property" in Savannah; and is about to sell the property levied on. Petitioner is not indebted to the city in any sum, either as a tax or license for being engaged in said business, or for any other purpose.   He is not engaged in said business.   He prepared an affidavit of illegality and a good bond which he tendered the marshal, but the marshal subsequently returned them to him, and is now proceeding with the levy.   Petitioner prays for injunction, temporary and permanent.   Defendants answered, that no cause for injunction was set forth in the petition; that it appeared from the petition that petitioner was not entitled to the relief asked for; and that petitioner was subject to the tax mentioned.   Temporary injunction was granted, and defendants excepted.

At the hearing the sworn petition was introduced.   Also, the affidavit of Ben Jackson:   During the past six months I have borrowed $4 from Gresham.   Deposited my watch with him as security.   Paid the money back within ten days after the loan, paying $4 only, not paying and not having been charged any interest, and there was no understanding that any interest was to be paid.   Never borrowed money before or since from Gresham, for which I deposited property as security.   Understood when I borrowed the $4 that it was loaned

as a matter of accommodation because of my urgent need, being one of Gresham's regular customers for groceries, etc. Also, affidavit of John Cain: Early in 1896 I borrowed $4 after much urging, as a matter of accommodation, from Gresham, with whom I deal for my groceries and supplies. I offered Gresham interest on the money, which was declined upon the ground that he was not allowed to do that kind of business. I returned the $4 to him without any interest. During the time I had the money I left with Gresham a sewing-machine as security. The money was loaned purely as a courtesy and accommodation. Also, affidavit of Gus Watson: In January, 1896, I had an organ pledged with another party for a debt due him, which would have been lost had it not been redeemed, and I borrowed from Gresham, with whom I deal for groceries, $25 with which to pay the debt and get back the organ. Gresham at first refused, but being further urged he finally consented and loaned me the $25 in order to save the organ, as a matter of courtesy and accommodation. I paid the $25 and no more, not paying any interest, Gresham accommodating me because I was a good customer. Gresham testified: My business is the grocery and liquor business. I have a system of extending credit to my patrons by the use of checks. I take an order and issue a check in payment—checks like that introduced in evidence. My customers give me an order, and I charge it on my little book and take the order. This is one of the orders, and it is the same as the others: "Savannah, Ga., April 10, 1896. Paymaster of the Central of Georgia. Please pay to A. J. Gresham $26.85 and deduct the same from my April salary, and oblige, Irving Kennedy." I issue a ticket and in return get such an order for the face value of the ticket. They are not "O. K'd." at all. I had a number of these orders all taken in the regular course of my business. Those taken this month were the same as those taken heretofore. It is my regular way of doing business to save bookkeeping. (Plaintiff here put in ten of these orders, dated April 10, 1896, none of which had been "O. K'd.") I have got the paymaster to accept these orders before pay-day only where I do not know whether the man is on the force or

not. A customer gets a dollar's worth of goods and I punch out a dollar. When he comes to get a dollar (they sometimes want medicine and green meats, and they have got to have five dollars to pay them out of the barracks), I say all right, and I punch out ten or sometimes fifteen cents on the dollar, and perhaps twenty. The basis of punching out more than the actual amount is, where they come and get fifty cents I punch out more just as though I have sold them fifty cents worth of merchandise and charge a profit on the amount sold. Otherwise I would be transacting that business for nothing. I got this idea of conducting this form of credit in the turpentine business. In regard to the Thompson mentioned in the affidavit of Kelly, the deputy-marshal, Kelly simply asked me if I did business with Thompson and ever loaned him any money. I said I may have loaned him money, but did not say anything about a sewing-machine in that regard. He asked if I ever loaned any money on a sewing-machine as security. I said I did take a sewing-machine and let the man have $4 on it. He just called off other names and said just in this way, " Did you ever loan money on an organ?" I said, " I loaned a customer $25 to keep his organ from being carried away from the city, but I did not charge him a penny's worth of interest." He asked if I ever loaned money on a watch, and I told him that in my absence a man got $4 from my clerk, telling the clerk to keep his watch until the money was brought back; and when I came back I was informed of this by the clerk and when the man came back and paid the $4 he got the watch. In none of these cases have I received a cent of interest where personal property has been deposited with me to secure a loan. I did not take any interest, because I knew it was against the law. I loaned Fred Hazel different amounts on exactly the same principle. I would punch the checks and let him have the money to pay his rent and sometimes for fresh meat. The customer who holds one of these tickets may get money advanced in lieu of goods. The tickets are issued as a basis of credit for goods. Gus Watson has been doing business with me for quite a while. I did not admit in the presence of the finance committee that I had loaned money in small amounts

to various parties on personal property and at large rates of interest. (*Cross-examined.*) Where a customer wants fifty cents of groceries, I just punch fifty cents exactly as if he paid the cash. I have a profit on the goods. I charge them just like anybody who had got the goods and paid cash. If I give him a ticket for $10, he gives me an order for only $10. When they get money, then I charge them interest and punch it out. As to what I generally charge, it is owing to the customer. If he is a good customer and I have loaned him two or three dollars a month to buy a little green meat and drugs, I haven't charged anything. I sometimes charge them fifteen or twenty per cent. for the month. I have done that right straight along. If a man is working for the Central R. R., I do not take any security for five dollars loaned him. I just give him those tickets voluntarily, and he gives me an order to save trouble; and if he says I do not want groceries but I want five dollars, I tell him I do not want to do business that way. I do not think I have ever loaned money at interest, except to a regular customer; would not swear on that, because I do not remember; I might have, but I know they were all customers of mine; I wouldn't swear that I have not, because I might have loaned in some cases. They would be customers I would consider, because they trade with me; they all traded with me, I believe. I have accommodated money to men who buy from me and who run no particular credit. I don't know what you consider a customer. If he is a cash customer, I would consider them all customers—that's what I consider them. I wouldn't swear that I never loaned any money at interest during 1896 to a person except where he bought from me, but I believe that; I don't remember ever having done it. Before this execution was brought, when I got an order like that set out above, I would take it to the paymaster the same as I will others. I have already taken up some. Before the city claimed this money I just took them to him. He put O. K. on them only in cases where I want to know if this man is on the pay-roll. He knows nothing about my having these orders until I carry them in. I take the entire chance. I would not consider a man a customer who borrows, unless he traded with me. I

am not in the money-lending business, although sometimes I have let people have money at interest where they take· some in groceries; I don't remember letting any one have money unless they traded with me.   I charge him interest and get his order for my money, and I expect that man to come in and trade with me, but he is not bound to do it.   When I let Watson have the money I did not expect him to pay interest on it. I told him, when I gave him the money on January 15th, that on account of the city claiming a license I could not take interest; this was before I got the notice from the city.   I couldn't charge him if he let me have a watch.   I will swear I never have charged a man, because I knew I was not allowed to do it.   (*Redirect.*)   When these tickets are not entirely used, the party comes up pay-day and says, here is a check I have not traded out, and I gave you an order for $10, and here is a balance of $5 on the check.   I say, here is your $5, and take the check back.   I never retain anything for the $5 which I pay him back, but give him fully just what the card calls for.   I always retain the difference between the amount of the check and the amount collected from the paymaster.   I can not say there is no case this year where I have loaned money to any one other than a person to whom tickets were issued for the purpose of trading them out primarily in groceries.   I might have done so.   Can not recall such an instance.   Do not hold myself out to the public as being prepared to advance money in that manner, and am not engaged in the business of lending money in that manner.   If I have done so, it has been an exceptional case to some friend or customer's friend.

Defendants introduced the affidavit of Kelly: Am deputy city marshal and was at the meeting of the finance committee of the city at the hearing of the petition of Gresham to be relieved from the tax of $250, which petition was before the city council February 12, 1896, and was referred to the finance committee, the adverse report of which was adopted by council February 26.   At this hearing before the finance committee Gresham admitted, in response to questions put to him, that on or about February 1, 1896, he loaned $4 upon a watch,

that about the same date he loaned Mack Thompson $15 or $20 on a sewing-machine, that between January and February, 1896, he loaned Fred Hazel $12, and that he had loaned money during 1896 to George Waters on an organ, the amount being $20, and he admitted that he expected to have returned on the short loan (as deponent understood for thirty days) $26 for this loan of $20. It appeared at this investigation that Gresham was in the habit of lending money on cards to employees of the road and others who dealt with him, charging therefor large interest. Also, affidavit of William Garrard and others, members of the finance committee, similar to the affidavit of Kelly. Also, the affidavit of Joseph Rogers: I worked for the C. R. R. at Savannah for five or six months up to February, 1896. During each month of this time I borrowed from Gresham, and he charged me twenty cents for each dollar advanced. I secured him by an order on the paymaster of the C. R. R. for the amount advanced, plus the interest, which would be "O. K'd." by the paymaster, and this amount, with interest, would be collected by Gresham from the C. R. R. on pay-day. I borrowed money twice in this way during the present year, paying interest to Gresham at the rate mentioned; and other employees of the C. R. R. did the same thing. Gresham would advance to any one working for the road at this rate of interest. Defendants put in evidence the petition of Gresham to the mayor and aldermen, dated February 7, 1896, which stated, among other things: It is his custom in the course of the business (general grocery and liquor business) to deal with a number of his customers on credit. He takes no security save an order on the employer of the customer for a stated amount. He issues to customers a 'card for such amount as may be agreed upon, to be punched as the purchases are made, the balance at the end of the month unpunched being good for so much money, or, as it may be, extended credit on it. In addition to their groceries and supplies his customers often need cash during the month for various expenses, and he often advances them small sums, punching the card for the sum loaned and interest, just as if there had been a purchase of groceries or anything else for like amount.

He has loaned no money for interest on articles of personalty deposited with him, nor on chattel mortgages; and what he does loan as aforesaid is simply to his customers and at their solicitation.

*Samuel B. Adams*, for plaintiffs in error.
*John Nicolson Jr.*, contra.